**Slip Op. 14-136**

UNITED STATES COURT OF INTERNATIONAL TRADE

PLASTICOID MANUFACTURING INC., :

                        *Plaintiff*, :

             v. :          Court No. 12-00407

UNITED STATES, :

                       *Defendant*. :

[Granting Plaintiff's Motion for Judgment on the Agency Record]

Dated:  November 24, 2014

    <u>Matthew P. McCullough</u>, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., argued for Plaintiff.  With him on the brief was <u>Daniel L. Porter</u>.

    <u>Tara K. Hogan</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant.  With her on the brief were <u>Stuart F. Delery</u>, Assistant Attorney General, and <u>Jeanne E. Davidson</u>, Director, and <u>Reginald T. Blades, Jr.</u>, Assistant Director, Commercial Litigation Branch.  Of counsel on the brief was <u>Elika Eftekhari</u>, Import Trade Administration, U.S. Department of Commerce, of Washington, D.C.

# OPINION

RIDGWAY, Judge:

    In this action, Plaintiff Plasticoid Manufacturing Inc. – a U.S. seller of "cutting and marking straight edges" – contests the determination of the U.S. Department of Commerce that straight edges imported by Plasticoid are within the scope of the antidumping and countervailing duty orders on aluminum extrusions from the People's Republic of China ("PRC").  *See* Aluminum Extrusions from the People's Republic of China:  Final Scope Ruling on Aluminum Rails for Cutting and Marking

Edges (Nov. 13, 2012) (Doc.  No.  15) ("Scope Ruling").[1]

Pending before the Court is Plasticoid's Motion for Judgment on the Agency Record, in which Plasticoid argues that the straight edges at issue should be exempt from the coverage of the antidumping and countervailing duty orders ("the Orders") pursuant to language that defines the scope of the Orders to exclude "finished merchandise."  *See generally* Plaintiff's Memorandum of Points and Authorities in Support of [Its] Motion for Judgment on the Agency Record ("Pl.'s Brief"); Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion for Judgment on the Agency Record ("Pl.'s Reply Brief").

The Government opposes Plasticoid's motion and maintains that Commerce's Scope Ruling is supported by substantial evidence and is otherwise in accordance with law, and therefore should be sustained.  *See generally* Defendant's Opposition to Plaintiff's Motion for Judgment Upon the

---

[1]Although the first page of the Scope Ruling is dated "November 23, 2012," that date is not correct.  *See* Scope Ruling at 1; *see also* Plaintiff's Memorandum of Points and Authorities in Support of [Its] Motion for Judgment on the Agency Record at 1 ("Pl.'s Brief") (specifying incorrect date for Scope Ruling); Defendant's Opposition to Plaintiff's Motion for Judgment Upon the Agency Record at 2 ("Def.'s Brief") (same).  As specified on the last page of the Scope Ruling, and as indicated in the Federal Register notice, the correct date is November 13, 2012.  *See* Scope Ruling at 12; Notice of Scope Rulings, 78 Fed. Reg. 32,372, 32,373 (May 30, 2013).

Because the challenged determination concerns both the antidumping and countervailing duty orders on aluminum extrusions from the PRC, the administrative record of the scope proceeding (which is entirely public) consists of two parts – one for the scope proceeding concerning the antidumping duty order and the other for the scope proceeding concerning the countervailing duty order.  All documents filed under the case number for the antidumping duty order, A-570-967, were also filed under the case number for the countervailing duty order, C-570-968.  However, the numbering of the documents differs.  *But see* Def.'s Brief at 2 n.1 (mistakenly stating that the documents filed under antidumping duty case number and "the documents filed under the countervailing duty case number are identically numbered").  For ease of reference, citations to the administrative record reflect the numbering of documents as filed under the case number for the antidumping duty order, A-570-067, and are noted as "Doc. No. _____."

Agency Record ("Def.'s Brief").

Jurisdiction lies under 28 U.S.C. § 1581(c) (2006).[2]  For the reasons summarized below,

Plasticoid's Motion for Judgment on the Agency Record must be granted, and this matter must be

remanded to Commerce for further consideration.

## I.  <u>Background</u>

The central issue in this action is whether Commerce properly determined that the straight

edges imported by Plasticoid are within the scope of the antidumping and countervailing duty orders

on aluminum extrusions from the PRC, which Commerce published in May 2011.  *See* Scope Ruling

at 1, 12; Aluminum Extrusions from the People's Republic of China:  Antidumping Duty Order, 76

Fed. Reg. 30,650 (May 26, 2011) ("Antidumping Duty Order"); Aluminum Extrusions From the

People's Republic of China:  Countervailing Duty Order, 76 Fed. Reg. 30,653 (May 26, 2011)

("Countervailing Duty Order").

### A.  <u>The Terms of the Antidumping and Countervailing Duty Orders</u>

In general, the Antidumping Duty Order and the Countervailing Duty Order cover

"aluminum extrusions which are shapes and forms, produced by an extrusion process," which are

imported from the PRC.  Antidumping Duty Order, 76 Fed. Reg. at 30,650.[3]  The Orders explain that

aluminum extrusions "are produced and imported in a wide variety of shapes and forms," and may

---

[2]All citations to statutes are to the 2006 edition of the United States Code.

[3]Citations in this section are to the Antidumping Duty Order only.  However, the language establishing the respective scopes of the antidumping and countervailing duty orders are identical. Accordingly, all provisions discussed in this section appear in both Orders.

be "finished (coated, painted, etc.), fabricated, or any combination thereof."  *Id*.  The Orders also

state that "[s]ubject aluminum extrusions may be described at the time of importation as parts for

final finished products that are assembled after importation," such as "window frames, door frames,

solar panels, curtain walls, or furniture."  *Id*., 76 Fed. Reg. at 30,650-51.  Aluminum extrusions "that

are attached (*e.g.*, by welding or fasteners) to form subassemblies" and that otherwise meet the

definition of aluminum extrusions are also included in the scope of the Orders, unless they are

partially assembled merchandise "imported as part of [a] finished goods 'kit,'" as discussed below.

*Id*., 76 Fed. Reg. at 30,651.

The Orders further note that subject aluminum extrusions "may be identified with reference

to their end use, such as fence posts, electrical conduits, door thresholds, carpet trim, or heat sinks,"

and state that "[s]uch goods are subject merchandise [*i.e.*, are covered by the Orders] if they

otherwise meet the scope definition, regardless of whether they are ready for use at the time of

importation."  Antidumping Duty Order, 76 Fed. Reg. at 30,651.

The language of the Orders expressly excludes from their scope certain merchandise that

would otherwise be covered, where the merchandise is a finished good at the time of importation

(the so-called "finished merchandise" exclusion) or where the merchandise as imported includes all

parts or components needed to assemble a final finished good (the so-called "finished goods kits"

exclusion).  Antidumping Duty Order, 76 Fed. Reg. at 30,651.

In particular, the finished merchandise exclusion exempts from the scope of the Orders

"finished merchandise containing aluminum extrusions as parts that are fully and permanently

assembled and completed at the time of entry, such as finished windows with glass, doors with glass

or vinyl, picture frames with glass pane and backing material, and solar panels." Antidumping Duty Order, 76 Fed. Reg. at 30,651. Similarly, the exclusion for finished goods kits exempts from the scope of the Orders "finished goods containing aluminum extrusions that are entered unassembled in a 'finished goods kit,'" which is defined to mean "a packaged combination of parts that contains, at the time of importation, all of the necessary parts to fully assemble a final finished good and requires no further finishing or fabrication, . . . and is assembled 'as is' into a finished product." *Id*. The two exclusions largely parallel one another, with one exclusion addressed to finished merchandise that is already assembled at the time of importation, while the other exclusion is addressed to finished merchandise that is unassembled.

One additional provision of the Orders is important to the analysis in this case – the so-called "fasteners exception" to the exclusion for finished goods kits. According to the fasteners exception, "[a]n imported product will not be considered a 'finished goods kit' and therefore excluded from the scope of the [Orders] merely by including fasteners such as screws, bolts, etc. in the packaging with an aluminum extrusion product." Antidumping Duty Order, 76 Fed. Reg. at 30,651.

## B.  The Straight Edges Imported by Plasticoid

Plasticoid entered a small volume of finished aluminum cutting and marking straight edges ("straight edges") from China in 2011 – the same year that the Orders were published – believing that the merchandise was not within the scope of the Orders. The straight edges that Plasticoid imported are used in drafting and cutting applications in the drafting and arts industries. As imported, the straight edges required no further manufacturing or assembly. Nor did they require mounting or use in combination with any other component, apparatus, or fixture. Each straight edge

consisted of a single hollow extrusion made of aluminum alloy, and was no more than 42.125 inches

long, less than 1.5 inches wide, and less than 0.4 inches tall.  The straight edges featured the flatness

and straightness required for precision drafting and cutting uses, and were available in a wide range

of finishes.  *See* Scope Ruling Request Submitted by Plasticoid Manufacturing Inc.:  Aluminum

Extrusions from the People's Republic of China (PRC) at 3, 6-7 (Oct. 9, 2012) (Doc. No. 2) ("Scope

Ruling Request").

     The top of each straight edge had a curved face, and one or more beveled edges to facilitate

precise marking and cutting.  Along the bottom face of each straight edge were grooves, to allow

for smooth gliding on work surfaces.  Similarly, the wall thickness at certain points along the length

of the straight edge was less than 0.77 millimeters, minimizing the weight of the straight edge in

order to maximize ease of use and maneuverability.  Other features included textured finger grips

along the length of the straight edge, for ease of manipulation and to help prevent the user's fingers

from slipping into the cutting or marking path.  Machined holes made it easy to mount the straight

edge, or to hang it for storage when not in use, if a user wished to do so.  Scope Ruling Request at

7.  Technical drawings and photos of the straight edges are included in the record.  *See id.* at Exhs.

1 & 2.

### C.  The Scope Proceeding

     Plasticoid received a notice from U.S. Customs and Border Protection in 2012, seeking

additional duties on the imported straight edges based on the Orders on aluminum extrusions from

the PRC.  Plasticoid responded by filing a request for a scope ruling with Commerce, arguing that

the straight edges were excluded from the scope of the Orders, relying on both the plain language

of the Orders themselves and various scope determinations that Commerce had issued.  *See* Scope

Ruling Request at 3.

In its Scope Ruling Request, Plasticoid explained that, as imported, the straight edges were

finished and ready for use, with no need for any other part, component, or element.  In addition,

Plasticoid argued that the fact that each straight edge consisted of a single aluminum extrusion did

not detract from the fact that the straight edges are finished, end use goods, and were – in and of

themselves – suited for the specific purpose for which they were produced.  And Plasticoid stated

that the straight edges reflected exactly the type of "downstream products that have been converted

into finished merchandise" that the Aluminum Extrusions Fair Trade Committee (*i.e.*, the domestic

industry "Petitioner" that initiated the underlying antidumping and countervailing duty

investigations) identified as being outside the scope of the Orders in those underlying investigations.

*See generally* Scope Ruling Request at 3-4.

To determine whether a particular product is included within the scope of an antidumping

or countervailing duty order, Commerce first considers the description of the product set forth in the

scope ruling request and the plain language of the order at issue, together with the information listed

in 19 C.F.R. § 351.225(k)(1) – specifically, the descriptions of the merchandise included in the

petition, in the records of the initial investigation, and in determinations of Commerce and the

International Trade Commission ("ITC"), including prior scope determinations.  *See* Scope Ruling

at 1-2; King Supply Co. v. United States, 674 F.3d 1343, 1345 (Fed. Cir. 2012) (noting that, "while

the plain language of the . . . order is paramount, Commerce must also take into account [the

materials specified in § 351.225(k)(1)]"); Walgreen Co. v. United States, 620 F.3d 1350, 1357 (Fed.

Cir. 2010) (stating that "it is the language of Commerce's final order that defines the scope of the order," albeit with the aid of other materials); Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1097 (Fed. Cir. 2002) (explaining that "a predicate for the interpretive process is language in the order that is subject to interpretation"); 19 C.F.R. § 351.225(k)(1) (2012).[4]

If Commerce determines that its § 351.225(k)(1) analysis is sufficient to decide the matter, then Commerce issues a final scope ruling. If that analysis is not dispositive, Commerce considers the five additional criteria set forth in 19 C.F.R. § 351.225(k)(2), known as the "Diversified Products criteria" – (1) the physical characteristics of the product, (2) the expectations of the ultimate purchasers, (3) the ultimate use of the product, (4) the channels of trade in which the product is sold, and (5) the manner in which the product is advertised and displayed. See 19 C.F.R. § 351.225(k)(2); Diversified Products Corp. v. United States, 6 CIT 155, 572 F. Supp. 883 (1983).

## D.   Commerce's Scope Ruling

In this case, Commerce found its analysis under 19 C.F.R. § 351.225(k)(1) to be dispositive – that is, Commerce concluded that the description of the straight edges in Plasticoid's Scope Ruling Request, together with the scope language and the descriptions of the subject merchandise in the Orders at issue, as well as prior scope rulings addressing those Orders, provided an adequate basis for an agency determination.[5] Commerce therefore found it unnecessary to consider the Diversified

---

[4]All citations to federal regulations are to the 2012 edition of the Code of Federal Regulations.

[5]The Scope Ruling stated that Petitioner did not submit comments to Commerce concerning Plasticoid's Scope Ruling Request. See Scope Ruling at 1. However, that statement is in error. Petitioner in fact did submit such comments at the agency level, although it elected not to intervene in this forum. See Aluminum Extrusions from the People's Republic of China:  Comments in

Products criteria set forth in § 351.225(k)(2) here.  *See* Scope Ruling at 10.[6]

In its Scope Ruling, Commerce concluded that Plasticoid's straight edges fell squarely within the scope of the Orders.  Scope Ruling at 12.  Commerce began its analysis by noting that the straight edges "[met] the description of subject extrusions" that is set forth in the Orders, and by highlighting the scope language concerning products referred to by their "end use" and products "ready for use at the time of importation."  *See id.* at 10-11.

The Scope Ruling stated that the straight edges did not qualify for the finished merchandise exclusion, characterizing the straight edges as "mere[] aluminum extrusions that meet the physical description of subject merchandise, referred to by their end use" and analogizing them to "door thresholds" and "carpet trim" – both of which are listed in the Orders as examples of products that are in-scope and referred to by their "end use."  Scope Ruling at 10; *see also id.* at 11 (emphasizing that the scope language of the Orders states that aluminum extrusions "identified by reference to

---

Opposition to Scope Ruling Request Regarding Cutting and Marking Straight Edges (Nov. 9, 2012) (Doc. No. 14) ("Petitioner's Opposition to Scope Ruling Request on Straight Edges").  In its comments filed with Commerce, Petitioner characterized the straight edges as "nothing more than fabricated aluminum extrusions," and argued generally that they are not "finished merchandise" excluded from the scope of the Orders because they "do not consist of assembled or completed parts" and are not "composed of aluminum extrusion(s), as well as other parts."  *Id.* at 3, 5. Petitioner further asserted that exclusion of the straight edges from the scope of the Orders "would lead to an absurd result," in that – according to Petitioner – "[n]early any aluminum extrusion with at least one straight edge could be used as a straight edge . . . and could be claimed as a 'finished' aluminum extrusion intended for such uses."  *Id.* at 7.

[6]In its Scope Ruling Request, Plasticoid similarly expressed the view that its request could be resolved under 19 C.F.R. § 351.225(k)(1), based solely on the scope language of the Orders and prior scope rulings issued by Commerce, such that resort to the <u>Diversified Products</u> criteria in § 351.225(k)(2) was unnecessary.  Of course, Plasticoid argued that any analysis – whether under § 351.225(k)(1) or § 351.225(k)(2) – would lead Commerce to conclude that Plasticoid's straight edges were excluded from the scope of the Orders.  *See generally* Scope Ruling Request at 8, 12-13.

their end use" are subject to the Orders if they "otherwise meet the scope definition").

The Scope Ruling deemed "irrelevant" Plasticoid's point that the straight edges had "an independent function" and were "not an element of a larger system, or lack[ing] an integral component," unlike door thresholds and carpet trim (which are listed in the Orders as examples of products that are in-scope), and unlike the products at issue in the Cleaning Systems Scope Ruling, the Railing Systems Scope Ruling, and the Fence Sections Scope Ruling (all of which Commerce had previously found to be within the scope of the Orders).  According to the Scope Ruling, those items were "merely aluminum extrusions referred to by their end use."  *See* Scope Ruling at 10-11; Final Scope Ruling on Certain Cleaning System Components (Oct. 25, 2011) ("Cleaning Systems Scope Ruling"), *currently on appeal*, Rubbermaid Commercial Products LLC v. United States, Court No. 11-00463; Final Scope Ruling on Certain Modular Aluminum Railing Systems (Oct. 31, 2011) ("Railing Systems Scope Ruling"); Final Scope Ruling on American Fence Manufacturing Company LLC's Fence Sections, Posts and Gates (Dec. 2, 2011) ("Fence Sections Scope Ruling").

In addition to the scope language in the Orders concerning products referred to by their "end use," the Scope Ruling also pointed to the scope language concerning products "ready for use at the time of importation."  Scope Ruling at 10-11.  The Scope Ruling stated that the scope language of the Orders expressly covers products that match the Orders' description of subject merchandise, without regard to whether the products are "identified by reference to their end use," and even if they are "ready for use at the time of importation."  *Id*.

The Scope Ruling further stated that the straight edges did not qualify for the finished merchandise exclusion for the same reason that Commerce decided that geodesic dome kits did not

meet the exclusion for finished goods kits – that is, both the straight edges at issue here and the geodesic domes at issue in one of Commerce's previous scope rulings consisted solely of aluminum extrusions.  Scope Ruling at 11; Final Scope Ruling on J.A. Hancock Co., Inc.'s Geodesic Structures (July 17, 2012) ("Geodesic Domes Scope Ruling").

Although the Scope Ruling was silent on the bulk of Plasticoid's arguments, it did acknowledge Plasticoid's position that the straight edges are "downstream products that have been converted into finished merchandise," and are thus exactly the type of product that, in the Precision Machine Parts scope proceeding, Petitioner indicated that it had intended to exclude from the scope of the Orders.  *See* Scope Ruling at 11; Final Scope Ruling on Precision Machine Parts at 9 (March 28, 2012) ("Precision Machine Parts Scope Ruling").  However, the Scope Ruling's treatment of Plasticoid's claim was non-responsive.

Specifically, the Scope Ruling seized on the fact that, in the Precision Machine Parts proceeding, Commerce "found that products which have undergone specialized machining processes may be considered subject merchandise because the scope [language of the Orders], as well as the International Trade Commission's (ITC) investigation, includes aluminum extrusions that have been 'fabricated.'"  Scope Ruling at 11; Precision Machine Parts Scope Ruling at 14-15; *see also id*. at 17.  The Scope Ruling then observed that the straight edges had "machined holes, a process which is specifically discussed in the scope [language] of the Orders," and stated that such fabrication "does not exclude [the straight edges] from the scope of the Orders" – though Plasticoid never claimed that it did.  *See* Scope Ruling at 11.

This action ensued.

## II.  **Standard of Review**

In an action contesting a scope ruling, Commerce's determination must be upheld except to the extent that it is found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); *see also* Sango Int'l, L.P. v. United States, 567 F.3d 1356, 1362 (Fed. Cir. 2009).  Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Universal Camera Corp. v. Nat'l Labor Relations Bd., 340 U.S. 474, 477 (1951) (quoting Consol. Edison Co. v. Nat'l Labor Relations Bd., 305 U.S. 197, 229 (1938)); *see also* Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375, 1380 (Fed. Cir. 2008) (same).

Moreover, any evaluation of the substantiality of the evidence "must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn." Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting Universal Camera Corp., 340 U.S. at 487-88); *see also* Mittal Steel, 548 F.3d at 1380-81 (same).  That said, the mere fact that it may be possible to draw two inconsistent conclusions from the record does not prevent Commerce's determination from being supported by substantial evidence.  Am. Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001); *see also* Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966).

Further, although Commerce "enjoys substantial freedom to interpret and clarify its . . . orders" via scope rulings, and is entitled to "significant deference," Commerce "cannot 'interpret'

an . . . order so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms." *See* Ericsson GE Mobile Communications, Inc. v. United States, 60 F.3d 778, 782 (Fed. Cir. 1995); Global Commodity Group LLC v. United States, 709 F.3d 1134, 1138 (Fed. Cir. 2013); Duferco Steel, 296 F.3d at 1095 (quoting Eckstrom Indus., Inc. v. United States, 254 F.3d 1068, 1072 (Fed. Cir. 2001)).  Antidumping and countervailing duty orders thus "may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it." Duferco Steel, 296 F.3d at 1089.

In addition, while Commerce must explain the bases for its decisions, "its explanations do not have to be perfect."  NMB Singapore, 557 F.3d at 1319-20.  Nevertheless, "the path of Commerce's decision must be reasonably discernable" to support judicial review. *Id*. (citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); *see generally* 19 U.S.C. § 1677f(i)(3)(A) (requiring Commerce to "include in a final determination . . . an explanation of the basis for its determination").

## III.  Analysis

Plasticoid contends that the Scope Ruling erred in concluding that the straight edges at issue are within the scope of the antidumping and countervailing duty orders on aluminum extrusions from the PRC, impermissibly expanding the scope of the Orders.  In particular, Plasticoid criticizes Commerce for failing to address Plasticoid's claim that the straight edges are "finished merchandise" within the meaning of the Orders and the intent of Petitioner, and are thus outside the scope of the Orders pursuant to the "finished merchandise" exclusion.  Similarly, Plasticoid faults each of the

three reasons set forth in the Scope Ruling as a basis for Commerce's determination.

As outlined below, a number of Plasticoid's arguments merit Commerce's further consideration.

### A. Plasticoid's Claim and the "Finished Merchandise" Exclusion

Plasticoid claims broadly that, in the Scope Ruling here, Commerce has interpreted the Orders in a manner that is fundamentally at odds with their meaning, structure, and intent, as manifest in the language and history of the Orders and Commerce's prior scope rulings. Plasticoid's overarching "theme" is that the Orders reflect a bright line distinction between mere "parts, elements or components" and "assemblies" containing aluminum extrusions (which are within the scope of the Orders) and "stand-alone," "finished, end use products" that are "fully functional independent of any other part, component, or element" (which are excluded). Pl.'s Brief at 7, 11, 12.[7] According

---

[7]*See also*, *e.g.*, Pl.'s Brief at 6 (referring to "the scope's inclusion of mere parts and components," and emphasizing that none of the specified exemplars "function[s] as an independent finished product"); *id*. at 7 (referring to "[t]he inclusion of parts, elements and components within the order[s] as distinguished from downstream products converted into finished merchandise"); *id*. (stating that prior scope rulings demonstrate that "[w]here the merchandise was simply one element or lacked an integral component, Commerce found that it was within the scope of the order[s]," but that "[w]here the product was fully functional independent of any other part, component, or element, . . . Commerce determined that the product was outside the scope of the order[s]"); *id*. at 11 (arguing that "[t]o the extent the scope rulings referenced by Commerce [in the determination at issue here] distinguished between parts or assemblies and stand-alone, finished goods, all share the common theme that parts or assemblies are within the scope, and stand-alone, finished goods are excluded from the scope"); *id*. (noting that "Commerce's analysis . . . never addresse[d] the distinction between parts and finished goods found in the scope language [of the Orders] and [Commerce's] scope determinations"); *id*. at 12 (asserting that Commerce ignored fact that specified "exemplars [listed in the Orders] are simply parts, elements or components, while [Plasticoid's] straight edges are finished, end use products"); *id*. at 13-14 (arguing that instant Scope Ruling "has included as part of [the] scope definition finished merchandise intended for use[] not as a part or component of some broader assembly or system, but for final independent end use," and asserting that Commerce has failed to recognize the distinction in the scope language "between the express inclusion of parts and

to Plasticoid, this distinction is reflected in the Orders' two exclusions for "finished merchandise" and "finished goods kits."

Relying on the scope language of the Orders, Plasticoid first asserts that the straight edges at issue "are final finished merchandise plainly contemplated by the [finished merchandise] exclusion," which – "expressly and unambiguously" – exempts from the scope of the Orders "finished merchandise containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry." Pl.'s Brief at 5; Antidumping Duty Order, 76 Fed. Reg. at 30,651; Countervailing Duty Order, 76 Fed. Reg. at 30,654. Plasticoid emphasizes that the straight edges "consist of a single part – [a] finished aluminum extrusion," that they "require no other part, component, or assembly after entry into the United States," and that they "have no other commercial use" except as straight edges for precision drafting and art applications. Pl.'s Brief at 5; *see also* Pl.'s Reply Brief at 6-7, 10.

Plasticoid further argues that the straight edges are readily distinguished from merchandise that the scope language of the Orders expressly identifies as in-scope merchandise, such as "fence

_____

the express exclusion of finished goods"); Pl.'s Reply Brief at 2 (arguing that Scope Ruling "fail[ed] to distinguish between (a) downstream products that have been converted into finished merchandise expressly excluded from the [Orders] and (b) mere parts and components . . . covered by the [Orders]"); *id*. at 4-5 (referring to "Commerce's scope determinations concerning parts or components as distinguished from downstream *finished* merchandise"); *id*. at 5 (asserting that scope language of Orders reflects "clear concern focused on aluminum extrusions that consist of loose, primary or intermediate parts, as distinguished from 'final finished goods'"); *id*. at 6 (arguing that "Petitioner[] recognized the difference between aluminum extrusion *parts* which are downstream products . . . , and downstream products *that have been converted into finished merchandise*," and that Petitioner[] w[as] concerned only about "parts"); *id*. at 6-7 (arguing that straight edges are "not the primary or intermediate downstream product (*i.e.*, parts) intended to be included within the scope of the order[s] and [are] readily distinguished from products that are"); *id*. at 7 (reiterating distinction between "*parts* subject to the [Orders]" and "finished merchandise not subject to the [Orders]").

posts, electrical conduits, door thresholds, carpet trim, [and] heat sinks." Pl.'s Brief at 6; Pl.'s Reply Brief at 7-8; Antidumping Duty Order, 76 Fed. Reg. at 30,651 (indicating that "fence posts, electrical conduits, door thresholds, carpet trim, [and] heat sinks" are within the scope of the Orders "if they otherwise meet the scope definition," even if "they are ready for use at the time of importation"); Countervailing Duty Order, 76 Fed. Reg. at 30,654 (same). Plasticoid argues that each of those listed examples "represents a product that may itself be 'finished,' but is just one element or component of a broader system," and that "[n]one of the [listed] examples function[s] as an independent finished product." Pl.'s Brief at 6.[8] In contrast, Plasticoid notes, the straight edges here are not "just one element or [an] integral component" of some "larger system or finished product." *Id*. Plasticoid concludes that the straight edges thus "differ significantly from the examples [of in-scope merchandise] provided in the scope language" of the Orders. *Id*.

Apart from its reliance on the express language of the Orders themselves (discussed above), Plasticoid also looks to scope rulings that Commerce has rendered in other cases, which, Plasticoid maintains, "confirm the conclusion that [the] straight edges are excluded" from the scope of the Orders. Pl.'s Brief at 7; *see generally id*. at 7-11. Specifically, Plasticoid states that – in every scope ruling addressing either the exclusion for finished merchandise or the exclusion for finished goods

---

[8]Illustrating its point that each of the listed items is "just one element or component of a broader system" and not "an independent finished product," Plasticoid explains:

> Fence posts are just one piece of a fencing system, as [Commerce] has found in numerous scope determinations . . . . In similar fashion, electrical conduits are merely components of an enclosed wiring system. Door thresholds operate in collaboration with an overall door unit. Likewise, carpet trim has no function independent of the carpet it is fitted to. The same may be said for heat sinks.

Pl.'s Brief at 6.

kits – Commerce has focused on whether the merchandise was "merely . . . one element of a larger

system" or whether the merchandise was "a final finished good," either after assembly (if a kit) or,

if not, at the time of importation. *Id.* at 7.  According to Plasticoid:  "Where the merchandise was

simply one element [of a larger system or finished product] or [where the merchandise] lacked an

integral component, Commerce found that it was within the scope of the [Orders].  Where the

product was fully functional independent of any other part, component, or element, . . . Commerce

determined that the product was outside the scope of the [Orders]." *Id.*[9]  Plasticoid argues that

---

[9]As one example involving the finished merchandise exclusion, Plasticoid cites the Cleaning Systems Scope Ruling.  *See* Pl.'s Brief at 7-8.  Commerce there found that mop frames and mop handles were within the scope of the Orders, reasoning that, absent mop heads or mop cloths, the mop frames and mop handles were not "completed cleaning device[s]" and thus were not "final, finished good[s]" for purposes of the finished merchandise exclusion.  Cleaning Systems Scope Ruling at 9.

In addition, Plasticoid cites the Baluster Kits Determination, the Awnings Scope Ruling, and a line of scope rulings addressing fencing and railing kits, all of which involved the exclusion for finished goods kits.  Pl.'s Brief at 7-9; Def.'s Brief at 16 (noting that Baluster Kits Determination and Awnings Scope Ruling addressed exclusion for finished goods kits); Issues and Decision Memorandum for the Final Determination in the Less-Than-Fair-Value Investigation of Aluminum Extrusions from the People's Republic of China at 27-28 (comment 3.H) (April 4, 2011) ("Baluster Kits Determination"); Final Scope Ruling on Certain Retractable Awning Mechanisms at 9-10 (Oct. 14, 2011) ("Awnings Scope Ruling"); Final Scope Ruling on Ameristar Fence Products' Aluminum Kitted Fences at 5-6 (Aug. 15, 2012); Final Scope Ruling on Origin Point Brands, LLC's Fence Panels, Posts and Gates at 9-12 (Dec. 13, 2011) ("Fence Panels, Posts, and Gates Scope Ruling"); Final Scope Ruling on Ameristar Fence Products' Aluminum Fence and Post Parts at 6 (Dec. 13, 2011); Fence Sections Scope Ruling at 10-12; Railing Systems Scope Ruling at 14-17.

Plasticoid posits that, in cases involving the exclusion for finished goods kits, "[t]he key factor is whether such kits provide all the necessary parts and components to assemble a final finished product."  Pl.'s Brief at 8.  As such, in the Baluster Kits Determination, Commerce found that the subject "packaged collection" of individual balusters was merely "a single element of a railing or deck system" and thus did not constitute a "finished product" for purposes of the finished goods kits exclusion.  Baluster Kits Determination at 28.  Similarly, in the Awnings Scope Ruling, Commerce determined that, without a textile awning (which was not included with the merchandise as imported and had to be purchased separately), the retractable awning mechanism there at issue

applying that rationale to the straight edges here leads inexorably to the conclusion that they are

excluded from the scope of the Orders.  In particular, Plasticoid emphasizes that the straight edges

as imported are ready for use – not in the sense that they are finished and ready for installation in

"some larger system or product," but, rather, because "their intended end-use application requires

only the straight edge itself."  *Id*. at 9.  "The straight edge, in and of itself, is the finished

merchandise." *Id*.[10]

---

lacked an "integral component[]" and thus did not fall within the finished goods kits exclusion. Awnings Scope Ruling at 9-10.  And, in the rulings involving fencing and railing kits, Commerce concluded that the products in question did not meet the requirements for exclusion as finished goods kits because, as Plasticoid puts it, "none of the products at issue provided all the parts and components necessary to assemble a complete fencing or railing system."  Pl.'s Brief at 8.

[10]As an aside, Plasticoid notes that the Scope Ruling at issue here includes a synopsis of select prior scope determinations, including the Baluster Kits Determination, the Cleaning Systems Scope Ruling, the Railing Systems Scope Ruling, the Fence Sections Scope Ruling, and the Banner Stands Scope Ruling.  *See* Pl.'s Brief at 9-10 (citing Scope Ruling at 5-8); Baluster Kits Determination; Cleaning Systems Scope Ruling; Railing Systems Scope Ruling; Fence Sections Scope Ruling; Final Scope Ruling on Banner Stands and Back Wall Kits (Oct. 19, 2011) ("Banner Stands Scope Ruling").  Plasticoid argues that "each synopsis underscores why straight edges . . . should be excluded" from the scope of the Orders; and Plasticoid faults Commerce for failing to "acknowledge[] how [the agency's] own characterizations of these prior scope rulings set straight edges apart."  Pl.'s Brief at 9-10.

Plasticoid emphasizes that, in the Scope Ruling here, "Commerce note[d] that 'the baluster kits represented a packaged *collection of individual parts*, which *comprised a single element of a deck system*, and, therefore, *did not represent a finished product*.'"  Pl.'s Brief at 10 (emphases added by Plaintiff) (quoting Scope Ruling at 5).  Plasticoid similarly highlights the fact that, in the instant Scope Ruling, "Commerce note[d] that the products [at issue in the Cleaning Systems Scope Ruling] were 'merely *subassemblies*' and designed to 'function collaboratively [with other products] to form *a completed cleaning device*,' but the 'components to make *a final cleaning device* were not part of a packaged combination at the time of importation.'"  Pl.'s Brief at 10 (emphases added by Plaintiff) (quoting Scope Ruling at 5).  Plasticoid further emphasizes that the Scope Ruling's synopsis of the Railing Systems Scope Ruling stated that "the product in that case 'cannot be classified as anything other than *parts*, as opposed to *stand-alone*, *fully-finished products*.'"  Pl.'s Brief at 10 (emphases added by Plaintiff) (quoting Scope Ruling at 6).  In addition, Plasticoid points to the Scope Ruling's synopsis of the Fence Sections Scope Ruling, where "Commerce . . .

In addition to its arguments based on the language of the Orders and on Commerce's prior scope rulings, Plasticoid also invokes the intent of Petitioner, which undergirds the Orders. Specifically, Plasticoid claims that the straight edges are "precisely the type of merchandise [that] Petitioner[] [in the underlying antidumping and countervailing duty investigations] sought to exclude from the scope of the [Orders]" – "namely 'downstream products that have been converted into finished merchandise'" (a reference to the position taken by Petitioner in the Precision Machine Parts Scope Ruling).  Pl.'s Brief at 5-6 (quoting Precision Machine Parts Scope Ruling at 9); *see also* Pl.'s Brief at 13; Pl.'s Reply Brief at 2, 5-7.

Commerce's response in the instant Scope Ruling was a complete *non sequitur*.  Commerce first noted that, "in the Precision Machine Parts Scope Ruling, [Commerce] found that products which have undergone specialized machining processes may be considered subject merchandise because the scope [language of the Orders], as well as the International Trade Commission's (ITC) investigation, includes aluminum extrusions that have been 'fabricated.'" Scope Ruling at 11 (citation omitted).  Commerce concluded that "[h]ere, Plasticoid's products have machined holes, a process which is specifically discussed in the scope [language] of the Orders," and thus "[such] fabrication does not exclude Plasticoid's products from the scope of the Orders." *Id*.  But, contrary to Commerce's implication, Plasticoid was not arguing that the straight edges are excluded from the scope of the Orders by virtue of their fabrication.  Commerce thus offered no substantive response

---

reaffirmed that the case turned on the fact that the products at issue 'did not contain all the parts necessary to fully assemble *a finished product*.'" Pl.'s Brief at 10 (emphasis added by Plaintiff) (quoting Scope Ruling at 6).  And, in contrast, Plasticoid observes that, in discussing the Banner Stands Scope Ruling, Commerce here "noted that the 'products at issue *contained all the parts* required to assemble a *completed exhibition frame*' and therefore met the exclusion for finished good[s] kits." Pl.'s Brief at 10 (emphases added by Plaintiff) (quoting Scope Ruling at 7).

to Plasticoid's reliance on the intent of Petitioner as manifest in the Precision Machine Parts Scope Ruling. *See* Pl.'s Brief at 13 (noting, *inter alia*, that Scope Ruling's discussion of Precision Machine Parts Scope Ruling is "nonsensical and misses the point"); *see also* Pl.'s Reply Brief at 2, 5-7 (discussing Precision Machine Parts Scope Ruling and its significance here).

In the Precision Machine Parts Scope Ruling, Commerce explained that Petitioner had advised that "the scope [of the Orders] was crafted to encompass all downstream products that have undergone subsequent processes, such as drawing, finishing, fabricating, etc." and that Petitioner had acknowledged that the scope might "indeed cover many thousands of aluminum parts." Precision Machine Parts Scope Ruling at 9. On the other hand, Commerce explained, Petitioner had also emphasized that "the scope does not encompass downstream products *that have been converted into finished merchandise*." *Id*. (emphasis added).[11] In the instant Scope Ruling, notwithstanding Plasticoid's pointed reference to the intent of Petitioner as expressed in the Precision Machine Parts Scope Ruling, Commerce made no attempt to explain the critical distinction that Petitioner there drew between "downstream products that have undergone subsequent processes" (which are intended to be within the scope of the Orders) and "downstream products that have been converted into finished merchandise" (which are intended to be excluded). Commerce gave no indication as

---

[11]Commerce has repeatedly stated that the intent of petitioners is generally accorded substantial weight in defining the scope of an order. *See generally*, *e.g.*, Awnings Scope Ruling at 5 n.6 (explaining, *inter alia*, that, under statutory scheme, Commerce "owes deference" to petitioners' intent in establishing scope of order, and that – in exercising agency's authority to define or clarify scope of order – agency must do so "in a manner which reflects the intent of the petition"); Final Scope Ruling on Clenergy (Xiamen) Technology's Solar Panel Mounting Systems at 5 n.10 (Oct. 31, 2012) ("Solar Panel Scope Ruling") (same); Fence Panels, Posts, and Gates Scope Ruling at 5-6 n.10 (same); Fence Sections Scope Ruling at 6 n.14 (same); Issues and Decision Memorandum for the Final Determination in the Less-Than-Fair-Value Investigation of Aluminum Extrusions from the People's Republic of China at 19 (comment 3.A) (April 4, 2011) (similar).

to what Petitioner possibly could have been referring to which would be more "finished" than the straight edges at issue here.  Nor did Commerce explain how the straight edges could have been any further "downstream" – or any more "finished" – than they were.

B.  The Stated Reasons for Commerce's Scope Ruling

Other than Commerce's "non-sensical" response to Plasticoid's reference to the Precision Machine Parts Scope Ruling, the instant Scope Ruling never directly addressed Plasticoid's arguments that its straight edges are "finished merchandise" within the meaning of the Orders and are thus excluded from the scope of the Orders pursuant to the finished merchandise exclusion. Instead, Commerce predicated its ruling on three other provisions of the Orders, discussed below in turn.[12]

---

[12]The Government contends that "Commerce reasonably determined that . . . the products do not meet the finished merchandise exclusion."  Def.'s Brief at 6; *see also id*. at 9 (asserting that "Commerce determined that the straight edges . . . do not constitute merchandise excluded under the finished merchandise exclusion").  It is true that the Scope Ruling stated that the straight edges "do not meet the exclusion for 'finished merchandise.'" *See* Scope Ruling at 12.  But it is also true that Commerce in fact did not address whether the straight edges constitute "finished merchandise containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry."

Unlike Commerce, the Government responds directly to Plasticoid's arguments that its straight edges are "finished merchandise" within the meaning of the finished merchandise exclusion. Specifically, in its brief, the Government argues that "Plasticoid's straight edges do not qualify for the 'finished merchandise' exclusion because they do not consist of parts that are fully and permanently assembled and completed at the time of entry."  The Government continues:  "To find, as Plasticoid proposes, that a single piece of aluminum extrusion falls within the finished merchandise exclusion would render the Orders' phrase 'as parts that are fully and permanently assembled and completed at the time of entry' meaningless."  *See* Def.'s Brief at 6-7.  In other words, according to the Government, the finished merchandise exclusion is limited to "products that consist of multiple parts that have been fully and permanently assembled at the time of entry," and thus does not apply to the straight edges here because each straight edge consists of "a single piece of hollow aluminum extrusion."  *Id*. at 10; *see generally id*. at 10-13, 15, 16.

1.  <u>Extrusions "Identified With Reference to Their End Use"</u>

The Scope Ruling first stated that Plasticoid's straight edges do not fall within the finished

merchandise exclusion because "[t]he scope [of the Orders] expressly includes aluminum extrusions

which are *identified by reference to their end use*."   Scope Ruling at 10 (emphasis added).

Specifically, the Orders state:

> Subject extrusions may be *identified with reference to their end use*, such as fence
> posts, electrical conduits, door thresholds, carpet trim, or heat sinks (that do not meet
> the finished heat sink exclusionary language [elsewhere in the scope language of the
> Orders]).  Such goods are subject merchandise if they otherwise meet the scope
> definition, regardless of whether they are ready for use at the time of importation.

Antidumping Duty Order, 76 Fed. Reg. at 30,651 (emphasis added); Countervailing Duty Order, 76

Fed. Reg. at 30,654 (emphasis added).  According to the Scope Ruling, "[l]ike the door thresholds

or carpet trim" listed in the Orders as examples of extrusions referred to by their end use,

Plasticoid's straight edges "are merely aluminum extrusions that meet the physical description of

subject merchandise, referred to by their end use:  as cutting and marking edges."  Scope Ruling at

10.

As Plasticoid notes, however, the Scope Ruling is "overly-simplistic" in relying on the "end

use" language in the Orders as a basis for concluding that the straight edges are in-scope.  *See* Pl.'s

----

Whatever the merits of the reasoning set forth in the Government's brief, that reasoning
played no part in Commerce's Scope Ruling and is therefore *post hoc* rationale.  Recording of Oral
Argument at 9:07-9:55 (counsel for Plasticoid noting that Government's argument highlighting
scope language's reference to multiple "parts" and merchandise that has been "assembled"
constitutes impermissible *post hoc* rationale).  It is well settled that an agency determination cannot
be sustained on the basis of a rationale supplied after the fact by litigation counsel. *See* <u>Burlington
Truck Lines, Inc. v. United States</u>, 371 U.S. 156, 168-69 (1962).  As the Supreme Court has
underscored, "an agency's action must be upheld, if at all, on the basis articulated by the agency
itself."  <u>Motor Vehicle Mfrs. Ass'n</u>, 463 U.S. at 50.

Brief at 5.  Much as it has done in other scope rulings, Commerce here sought to invoke the "end

use" language as an all-purpose "catch all" to "capture Plasticoid's product within the scope of the

orders."  Pl.'s Reply Brief at 7.  But, contrary to Commerce's implication, "[t]he scope language

simply indicates that aluminum extrusions subject to the [Orders] 'may' be identified by their end

use.  It does not state that where aluminum extrusions are identified by their end use the finished

goods exclusion does not apply."  Pl.'s Brief at 11.  Plasticoid argues that the fact that its straight

edges are identified by their end use does not diminish their status as "a downstream product [that

has been] converted into finished merchandise."  *Id*. at 6, 12; *see also* Pl.'s Reply Brief at 6, 7-8.

        Plasticoid observes that the "fence posts, electrical conduits, door thresholds, carpet trim,

[and] heat sinks" listed in the Orders as examples of extrusions referred to by their end use may (at

least in one sense) be "finished," but – in reality – are merely elements or components of larger

systems or finished products.  In the words of Plasticoid, "[n]one of the examples function[s] as an

independent finished product."  Pl.'s Brief at 6, 12; *see also* Pl.'s Reply Brief at 6-7.  The straight

edges, by contrast, are not merely a single "element or integral component of a larger system or

finished product" but instead themselves "function as independent finished product[s]."  Pl.'s Brief

at 6, 12;  *see also* section III.A, *supra*.  The Scope Ruling sought to dismiss Plasticoid's distinction

out of hand, arguing (in a rather circular fashion) that "the fact that [the straight edges] are not an

element of a larger system, or lack an integral component . . . is irrelevant" because the referenced

exemplars (*i.e.*, "fence posts, electrical conduits, door thresholds, carpet trim, [and] heat sinks") "are

merely aluminum extrusions referred to by their end use."  Scope Ruling at 10; *see also id*. at 11

(pointing out "the express inclusion of subject extrusions in the scope of the Orders that may be

identified by reference to their end use"); Def.'s Brief at 6, 14-15 (asserting that "Commerce reasonably determined that, regardless of their identification by their end use . . . , [the straight edges] do not meet the finished merchandise exclusion," and disputing Plasticoid's comparison of its merchandise to exemplars listed in Orders). Again, as Plasticoid notes, "Commerce's analysis is far too simplistic." Pl.'s Reply Brief at 7-8.

Commerce's reliance on the "end use" language is, in any event, misplaced. Plasticoid does not argue (and has never argued) that its straight edges are excluded from the scope of the Orders merely because the straight edges are "identified by reference to their end use." It would be equally ridiculous for Commerce to suggest that merchandise that is identified by reference to its end use is *ipso facto* within the scope of the Orders.

As Petitioner aptly observed in the Refrigerator/Freezer Trim Kits proceeding, in fact "[t]he scope of the Orders does not include or exclude [products] based on their end uses." Final Scope Ruling on Refrigerator/Freezer Trim Kits at 9 (Dec. 17, 2012) ("Refrigerator/Freezer Trim Kits Scope Ruling"), *currently on appeal*, Meridian Products, LLC v. United States, Court No. 13-00018.[13] And, significantly, the Orders expressly exclude from their scope a number of products that are specifically identified by reference to their end use, including "finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels." Antidumping Duty Order, 76 Fed. Reg. at 30,651; Countervailing Duty Order, 76 Fed. Reg. at 30,654; *see also* Pl.'s Brief at 11 (highlighting the Orders' express exclusion of finished

---

[13]Petitioner reiterated this point in the instant scope proceeding: "[T]he scope . . . does not include or exclude [products] based on their end uses." Petitioner's Opposition to Scope Ruling Request on Straight Edges at 6.

merchandise identified by reference to end use).

Contrary to Commerce's statements in the Scope Ruling, the fact that Plasticoid's straight edges are "identified by reference to their end use" does not preclude them from constituting "finished merchandise" for purposes of the finished merchandise exclusion. Moreover, nothing in the Scope Ruling responded substantively to the distinctions that Plasticoid draws between its merchandise and the "fence posts, electrical conduits, door thresholds, carpet trim, [and] heat sinks" listed in the Orders as exemplars of in-scope products.

## 2.  Extrusions "Ready for Use at the Time of Importation"

Commerce's Scope Ruling also underscored "the fact that [Plasticoid's] products are *ready for use at the time of importation*," asserting that this fact "does not, by itself, result in the products' exclusion from the Orders." Scope Ruling at 10-11 (emphasis added); *see also* Def.'s Brief at 6 (arguing that "Commerce reasonably determined that, regardless of . . . whether they are ready for use at the time of importation, [the straight edges] do not meet the finished merchandise exclusion"). Commerce noted that the scope language in the Orders "indicates that products otherwise meeting the scope definition for subject merchandise are covered under the Orders," without regard to whether the products are "ready for use at the time of importation" (Scope Ruling at 11):

> Subject extrusions may be identified with reference to their end use, such as fence posts, electrical conduits, door thresholds, carpet trim, or heat sinks (that do not meet the finished heat sink exclusionary language [elsewhere in the scope language of the Orders]). Such goods are subject merchandise if they otherwise meet the scope definition, *regardless of whether they are ready for use at the time of importation*.

Antidumping Duty Order, 76 Fed. Reg. at 30,651 (emphasis added); Countervailing Duty Order, 76 Fed. Reg. at 30,654 (emphasis added); *see also* Def.'s Brief at 9-10 (noting that products "ready for

end use at the time of exportation" are not excluded if they otherwise "meet the physical description" in the Orders).

Notably, however, Plasticoid does not claim (and has never claimed) that the fact that its straight edges are "ready for use at the time of importation" is alone sufficient to exclude them from the scope of the Orders.  Rather, Plasticoid emphasizes that the use for which its merchandise is "ready . . . at the time of importation" is fundamentally different than the use for which the "fence posts, electrical conduits, door thresholds, carpet trim, [and] heat sinks" listed in the Orders are ready at the time those products are imported.

As Plasticoid explains, the "fence posts, electrical conduits, door thresholds, carpet trim, [and] heat sinks" listed as exemplars in the Orders are "ready for use at the time of importation" in the sense that they are "ready to be installed in some larger system or product."  *See* Pl.'s Brief at 9.  On the other hand, use of Plasticoid's straight edges upon importation "requires only the straight edge itself."  *Id*.  Unlike the "fence posts, electrical conduits, door thresholds, carpet trim, [and] heat sinks," the straight edges are not part of any larger system or product.  "The straight edge, in and of itself, is the finished merchandise."  *Id*.

Commerce's reliance on the language of the Orders concerning "read[iness] for use at the time of importation" thus provided no greater support for the Scope Ruling than the language concerning "end use," discussed above.  Nowhere in the Scope Ruling did Commerce address the merits of Plasticoid's observations concerning the straight edges' "read[iness] for use at the time of importation" and the relative "read[iness]" of the "fence posts, electrical conduits, door thresholds, carpet trim, [and] heat sinks" listed in the Orders.  Moreover, even Commerce does not contend that

"read[iness] for use at the time of importation" is irrelevant to a product's status as "finished merchandise" for purposes of exclusion from the scope of the Orders.  By referring to merchandise that is "fully and permanently assembled and completed at the time of entry," the finished merchandise exclusion essentially requires that excluded products be "ready for use at the time of importation."

Notwithstanding anything in the Scope Ruling, the fact that Plasticoid's straight edges are "ready for use at the time of importation" does not preclude them from constituting "finished merchandise" for purposes of the finished merchandise exclusion.  Commerce's emphasis on "readiness for use" as a basis for ruling the straight edges in-scope is unavailing.

### 3.   The "Fasteners Exception" to the "Finished Goods Kits" Exclusion

As Commerce's third and final reason for concluding that Plasticoid's straight edges do not fall within the Orders' exclusion for "finished merchandise," the Scope Ruling cited the "fasteners exception" to the "finished goods kits" exclusion.  *See* Scope Ruling at 11.  In relevant part, the Orders state:

> The scope . . . excludes [1] finished merchandise containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry, such as finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels.  The scope also excludes [2] finished goods containing aluminum extrusions that are entered unassembled in a "finished goods kit."   A finished goods kit is understood to mean a packaged combination of parts that contains, at the time of importation, all of the necessary parts to fully assemble a final finished good and requires no further finishing or fabrication, such as cutting or punching, and is assembled "as is" into a finished product.  *An imported product will not be considered a "finished goods kit" and therefore excluded from the scope of the* [*Orders*] *merely by including fasteners such as screws, bolts, etc. in the packaging with an aluminum extrusion product.*

Antidumping Duty Order, 76 Fed. Reg. at 30,651 (emphasis added); Countervailing Duty Order, 76

Fed. Reg. at 30,654 (emphasis added).

On this issue, the Scope Ruling here relied heavily on the Geodesic Domes Scope Ruling,

which involved both the finished goods kits exclusion and the fasteners exception to that exclusion.

*See generally* Scope Ruling at 11; Geodesic Domes Scope Ruling.  As the instant Scope Ruling

explained, Commerce found that the product in that case – a kit for the construction of a geodesic

dome, consisting of a set of extruded aluminum pipes (color-coded and cut to various lengths, with

crimping and boring at the ends), together with the necessary fasteners and assembly instructions

– "contained all the parts necessary to assemble a complete geodesic dome and, thus, met the 'initial

requirements for . . . the finished goods kit exclusion.'"  Scope Ruling at 11 (quoting Geodesic

Domes Scope Ruling at 7); *see also* Geodesic Domes Scope Ruling at 5.  Commerce nonetheless

found the geodesic dome kits to be covered by the Orders, due to the fasteners exception, which

provides that "[a]n imported product will not be considered a 'finished goods kit' . . . merely by

including fasteners such as screws, bolts, etc. in the packaging with an aluminum extrusion product."

Commerce reasoned that, because (other than the fasteners and the assembly instructions) the

geodesic dome kit consisted entirely of aluminum extrusions, the fasteners exception to the finished

goods kits exclusion was applicable, precluding the exclusion of the geodesic dome kit from the

scope of the Orders.  *See* Scope Ruling at 8, 11; Geodesic Domes Scope Ruling at 7.

In the Scope Ruling at bar, Commerce emphasized that Plasticoid's straight edges "consist

entirely of aluminum extrusions."  Scope Ruling at 11.  By analogy to the Geodesic Domes Scope

Ruling, Commerce concluded that – because each of the straight edges consists of a single aluminum

extrusion – the straight edges therefore "do not meet the exclusion for finished merchandise." *Id.*; *see also* Def.'s Brief at 12-13.

Plasticoid protests that, as a matter of law, the fasteners exception that is at the heart of the Geodesic Domes Scope Ruling is, on its face, limited to the finished goods kits exclusion. And, as Plasticoid emphasizes, Plasticoid's claim is that the straight edges qualify for a different exclusion – *i.e.*, the finished merchandise exclusion. *See generally* Pl.'s Brief at 10-11, 12; *see also* Defendant's Response to Comments Regarding the Second Remand Redetermination at 12 n.7 (Aug. 8, 2014), filed in Meridian Products, LLC v. United States, Court No. 13-00018 (highlighting fact that "[t]he orders identify the finished goods kit exclusion and the finished merchandise exclusion as two separate exclusions").[14]  Moreover, Plasticoid argues that there are dispositive factual differences between the merchandise at issue in the Geodesic Domes Scope Ruling and the merchandise here, above and beyond the fact that the Geodesic Domes Scope Ruling involved a kit and this case does not. In particular, Plasticoid contends that, aside from the fasteners (and the assembly instructions), the geodesic dome kits were "simply a collection of aluminum extrusion parts with no independent end use" and were "therefore very different from the straight edges at issue here." Pl.'s Brief at 12-13.[15]  Neither of these points was addressed in Commerce's Scope

---

[14]*But see, e.g.*, Final Scope Ruling on Kitchen Appliance Door Handles With Plastic End Caps and Kitchen Appliance Door Handles Without Plastic End Caps at 19-20 (Aug. 4, 2014) ("Scope Ruling on Kitchen Appliance Door Handles With and Without Plastic End Caps") (rejecting argument that fasteners exception applies only to exclusion for finished goods kits, and not to exclusion for finished merchandise).

[15]Plasticoid dismisses the geodesic dome kits as "generic extruded aluminum tube[s]" and "non-descript article[s] of extruded aluminum," and argues that "[t]here is no comparison" between its straight edges and those kits. Pl.'s Reply Brief at 8-9 (comparing and contrasting straight edges and geodesic dome kits, and analyzing implications for scope of Orders).

Ruling.  Nor does the Government address them in its brief.

In addition, neither the Scope Ruling here nor any authority cited in the Scope Ruling

articulated any real rationale for the rule set forth in the Geodesic Domes Scope Ruling and applied

in this case.  Among other things, Commerce has not directly addressed Plasticoid's claim that the

purpose of the fasteners exception is "to limit the ability to circumvent the [Orders] by shipping

parts, elements and components under cover of the 'finished goods kits' exclusion by simply

resorting to the nominal act of adding fasteners to the shipment."  Pl.'s Brief at 7.

Although the Scope Ruling and the Geodesic Domes Scope Ruling said little or nothing

about the rationale for the fasteners exception and the manner in which it has been applied by

Commerce, other scope rulings have shed some modest light on the matter.  In the March 2014

Scope Ruling on Curtain Wall Units, for example, Commerce stated that it had determined that,

"because the scope [of the Orders] expressly covers aluminum extrusions, it would be inconsistent

with the scope to exclude a kit that consists only of aluminum extrusions and fasteners."  Final

Scope Ruling on Curtain Wall Units that are Produced and Imported Pursuant to a Contract to

Supply a Curtain Wall at 24 (March 27, 2014).

Similarly, in the second remand determination filed in Meridian Products (a challenge to the

Refrigerator/Freezer Trim Kits Scope Ruling), Commerce explained that its first remand

determination rested on the agency's conclusion that "permitting finished goods that consist entirely

of aluminum extrusions to be excluded as finished goods would gut the scope [of the Orders], which

covers aluminum extrusions."  Final Results of Redetermination Pursuant to Court Remand at 7

(dated June 13, 2014) ("Meridian Second Remand Determination"), filed in Meridian Products, LLC

v. United States, Court No. 13-00018.  To much the same effect is the Kitchen Appliance Door

Handles Scope Ruling, where Commerce stated that "to consider a product which consists only of

aluminum extrusions as a finished goods kit or [as a] final, finished good would mean that the

exception to the scope of the Orders would swallow the scope, because any aluminum extrusion

product, as long as it can be identified by end use, could be considered a final product" – a result

deemed "contrary to the scope itself, which covers aluminum extrusions."  Final Scope Ruling on

Meridian Kitchen Appliance Door Handles at 14 (June 21, 2013) ("Kitchen Appliance Door Handles

Scope Ruling").[16]

Although "[Commerce's] explanations do not have to be perfect," NMB Singapore, 557 F.3d

at 1319-20, "the path of Commerce's decision must be reasonably discernable" to support judicial

review.  Id. (citing Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43).  The path of Commerce's decision

is not sufficiently discernable on the record of this proceeding.

---

[16]See also, e.g., Scope Ruling on Kitchen Appliance Door Handles With and Without Plastic End Caps at 20 (asserting that "determining that a product which consists only of aluminum extrusions and fasteners satisfies the finished good exclusion would permit this exclusion to the Orders to swallow the scope, because any aluminum extrusion product, as long as it can be identified by end use, could be considered a finished product" – again, a result deemed "contrary to the scope itself, which covers aluminum extrusions"); Final Results of Redetermination Pursuant to Court Remand at 19, 22 (dated Aug. 14, 2013) ("Meridian First Remand Determination"), filed in Meridian Products, LLC v. United States, Court No. 13-00018 (stating that "if the inclusion of minor [non-extrusion] accessories in a kit could render it non-subject, importers could easily evade the Order[s] by including one piece of extraneous plastic in a 'kit' which [otherwise] consists only of aluminum extrusions"; asserting that "permitting finished goods that consist entirely of aluminum extrusions to be excluded as finished goods kits would gut the scope [of the Orders], which covers aluminum extrusions," and arguing that, under such a hypothetical exclusion, "it is possible if not likely that any aluminum extrusion product, when merely packaged with other extraneous non-aluminum extrusion parts, could be excluded from the scope of the Orders"); Def.'s Brief at 12 (arguing that, "[i]f a single piece of extruded aluminum, such as Plasticoid's product, constituted 'finished merchandise' under the exclusion, the scope of the Orders could be construed to exclude all aluminum extrusions").

Lastly, even if Commerce had spelled out in the Scope Ruling here some reasonable version of the rationale that the agency has since provided in other scope determinations – *i.e.*, the expressed concern about the potential for the exclusions to "gut" or "swallow" the scope of the Orders – any articulated rationale also must be substantively sound.  At least on the existing record, it is unclear why other scope language in the Orders (such as the restrictions limiting the finished merchandise exclusion to only that "finished merchandise" that is "fully and permanently assembled and completed at the time of entry") would not suffice to keep the proverbial floodgates firmly closed. *See*, *e.g.*, Final Scope Ruling on Rheetech Sales & Services Inc.'s Screen Printing Frames with Mesh Screen Attached at 13 (Aug. 7, 2014) (recognizing that "the mere existence of non-extruded parts along with extruded aluminum parts does not necessarily render merchandise outside of the scope [of the Orders]," and emphasizing that "the scope [language of the Orders] includes additional criteria in the finished good exclusion that must be satisfied for merchandise to fall outside the scope"); Final Scope Ruling on Fan Blade Assemblies at 17 (July 25, 2014) (same).[17]

Among other things, any sound rationale must be consistent with the history and intent of the Orders.  The gravamen of the Geodesic Domes Scope Ruling, as applied in this case and others, amounts to a *per se* rule that any merchandise that consists of 100% aluminum extrusions falls within the scope of the Orders, even if the merchandise is "finished" and is "fully and permanently assembled and completed at the time of entry," and would otherwise qualify for the finished merchandise exclusion.  As Commerce explained in the Awnings Scope Ruling, however, Petitioner

---

[17]*See also* Pl.'s Reply Brief at 1, 8-10 (challenging credibility of assertion that excluding merchandise such as straight edges at issue here will effectively "eviscerate" the Orders, and arguing that exclusion will not "lead to an onslaught of miscellaneous aluminum extrusion imports").

and the agency rejected the concept of such a rule in the course of the underlying antidumping and countervailing duty investigations. *See* Final Scope Ruling on Certain Retractable Awning Mechanisms at 5 (Oct. 14, 2011) ("Awnings Scope Ruling").

Specifically, in response to a proposal that would have required that both finished merchandise and finished goods kits fall within the scope of the Orders whenever the merchandise in question comprised 70% or 75% (or more) aluminum extrusions by weight, Commerce "agreed with Petitioner that kits and furnished products are excluded from the scope [of the Orders], *regardless of the percentage content of aluminum extrusions*." Awnings Scope Ruling at 5 (emphasis added). Commerce stated unequivocally that "[f]inished merchandise and unassembled kits containing aluminum extrusions are specifically excluded from the scope [of the Orders], *with no specification as to the percentage content of aluminum extrusions*." *Id.* (emphasis added). Commerce thus concluded that "finished products and unassembled kits that contain[] all the components for [a] finished product, *regardless of the percentage content of aluminum extrusions by weight*[,] are excluded from the scope" of the Orders. *Id.* (emphasis added).[18] Any reasonable

_____

[18] *See also*, *e.g.*, Defendant's Response to Comments Regarding the Second Remand Determination at 18-19 (Aug. 8, 2014), filed in <u>Meridian Products, LLC v. United States</u>, Court No. 13-00018 (discussing implications of unsuccessful proposal to require that merchandise comprising some specific percentage of aluminum extrusions by weight be included within scope of Orders, and attaching as an Addendum a copy of the relevant Preliminary Determination, which predated the Orders); Final Scope Ruling on Signature Partners Inc.'s Auto Trim Kits at 11 (July 16, 2014) (stating that Commerce has "declined to consider the value or percentage of aluminum extrusions in determining whether products satisfy the exclusion for finished goods kits"); Meridian First Remand Determination at 19, 22 (dated Aug. 14, 2013), filed in <u>Meridian Products, LLC v. United States</u>, Court No. 13-00018 (agreeing "that the percentage of aluminum content is irrelevant to determining whether merchandise is subject to the scope of the Orders"); Solar Panel Scope Ruling at 5 (similar to discussion in Awnings Scope Ruling); Fence Panels, Posts, and Gates Scope Ruling at 5 (same); Fence Sections Scope Ruling at 5-6 & n.13 (similar); Railing Systems Scope Ruling at 14 (explaining that, during underlying antidumping and countervailing duty investigations,

rationale for a rule that automatically places within the scope of the Orders all merchandise that consists of 100% aluminum extrusions – without regard to any other characteristics of that merchandise – must take into account the history of the Orders and the intent of Petitioner as reflected in that history.

In addition, a sound rationale guards against absurd results.  Based on the apparent rationale of the Scope Ruling here, on the Geodesic Dome Scope Ruling, and on other scope determinations interpreting the Orders to date, it seems that Commerce would conclude that Plasticoid's straight edges would have satisfied the requirements for exclusion as finished merchandise if a cap (or caps) made of plastic or other non-extruded aluminum material had been affixed to one or both ends of each straight edge at some point in time prior to importation, whether for decorative or protective purposes, or for some other reason.  *See*, *e.g.*, Recording of Oral Argument at 1:29:17-1:30:30 (probing whether simple expedient of adding plastic caps to ends of straight edges would result in exclusion of straight edges from scope of Orders).[19]  Such caps could not reasonably be viewed as "fasteners such as screws, bolts, etc."  *See* Antidumping Duty Order, 76 Fed. Reg. at 30,651; Countervailing Duty Order, 76 Fed. Reg. at 30,654.  *Compare* Final Scope Ruling on Kitchen Appliance Door Handles With Plastic End Caps and Kitchen Appliance Door Handles Without

---

Commerce "indicated that fencing products would be excluded regardless of the percentage content of aluminum extrusions by weight," provided that requirements for finished merchandise exclusion or finished goods kits exclusion were met); Banner Stands Scope Ruling at 11 & n.21 (reaffirming statement in Preliminary Scope Comments that "finished goods kits are excluded from the scope of the Orders, without reference to the percentage of aluminum extrusions").

[19]*See also* Recording of Oral Argument at 1:58:16-1:58:50 (counsel for Government stating that, if narrow piece of aluminum extrusion were "fully and permanently assembled into a piece of wood," to fashion a sort of wooden ruler, that product would fall within finished merchandise exclusion).

Plastic End Caps at 17-20 (Aug. 4, 2014) ("Scope Ruling on Kitchen Appliance Door Handles With and Without Plastic End Caps") (concluding that plastic end caps on kitchen appliance door handles functioned "analogous to a washer" (a form of "fastener"), such that door handles (which were comprised entirely of aluminum extrusions) were not excluded from the scope of the Orders).

This matter must be remanded to Commerce to permit the agency to reconsider Plasticoid's arguments on this point, as well as the bases for the agency's Scope Ruling, including, in particular, Commerce's interpretation and application of both the fasteners exception and the Geodesic Domes Scope Ruling in light of the specific circumstances of this case.  As set forth below, remand will afford Commerce the opportunity to articulate on the record a clear, coherent rationale for a reasonable interpretation of the relevant scope language in the Orders, mindful of, *inter alia*, the history of the Orders and the intent of Petitioner as reflected in that history.  In addition, as Commerce weighs the importance of maintaining the integrity of the Orders, Commerce shall also give appropriate consideration to any potential for unintended consequences, if not outright absurd results, that may be inherent in, or flow from, its interpretation.

C.  <u>Summary</u>

In light of the foregoing analysis, this matter must be remanded to Commerce for further consideration.  On remand, Commerce shall advise whether – but for the fasteners exception and the Geodesic Domes Scope Ruling and its progeny – the straight edges at issue would be considered "finished merchandise containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry" and therefore would be excluded from the scope of the Orders.

Further, Commerce shall respond point-by-point to Plasticoid's arguments that the straight edges constitute "finished merchandise" within the meaning of the Orders and within the intent of Petitioner as expressed in the Precision Machine Parts scope proceeding, where Petitioner differentiated "downstream products that have undergone subsequent processes" (which are intended to be in-scope) from "downstream products that have been converted into finished merchandise" (which are intended to be excluded). Commerce shall fully explain its understanding of the meaning of "downstream products that have been converted into finished merchandise" as that phrase was used by Petitioner (setting forth the bases for the agency's interpretation), and shall detail why the straight edges here are not such "downstream products . . . converted into finished merchandise," explaining specifically how the straight edges could have been any further "downstream" or any more "finished" than they were.

In this context, Commerce also shall respond to Plasticoid's overarching claim that the Orders clearly differentiate between "mere" parts, elements, components, and assemblies containing aluminum extrusions (which are in-scope) and "stand-alone," "finished, end use products" that are "fully functional independent of any other part, component, or element" (which are out-of-scope), and shall address the distinctions that Plasticoid draws between its straight edges and the "fence posts, electrical conduits, door thresholds, carpet trim, [and] heat sinks" listed as exemplars in the Orders.

To the extent that, on remand, Commerce continues to rely on the fasteners exception and the Geodesic Domes Scope Ruling, Commerce shall explain in detail the bases for its remand determination, explaining the purpose of the fasteners exception, and responding to each point that

Plasticoid has raised, including Plasticoid's argument that the fasteners exception applies only to the finished goods kits exclusion (and not to the finished merchandise exclusion), as well as Plasticoid's argument that there are essential factual differences between the merchandise at issue in the Geodesic Domes Scope Ruling and the merchandise here (other than the fact that the Geodesic Domes Scope Ruling involved a kit and this case does not).

Finally, on remand, Commerce shall articulate for the record a clear and coherent rationale for a reasonable and substantively sound interpretation of the relevant scope language in the Orders, which shall be grounded in the language of the Orders, and which shall address relevant history and the intent of Petitioner as reflected in that history, including the rejection of a proposal in the underlying investigations that would have added to the draft Orders a provision expressly including within the scope of the Orders all merchandise with aluminum extrusion content above a specified percentage.

To the extent that Commerce may conclude that its interpretation is necessary to avoid "gutting" the scope of the Orders (or to avoid having the exclusions "swallow" the scope of the Orders), Commerce shall detail the basis for that conclusion, explaining specifically how different competing interpretations would affect the outcome of a range of prior scope rulings and detailing why relevant scope language in the Orders (such as the restrictions limiting the finished merchandise exclusion to only that "finished merchandise" that is "fully and permanently assembled and completed at the time of entry") is not sufficient to ensure the integrity of the Orders.

Further, Commerce shall explain whether Plasticoid's straight edges would satisfy the requirements for exclusion as finished merchandise if a cap (or caps) made of plastic or other non-

extruded aluminum material had been affixed to one or both ends of each straight edge at some point

in time prior to importation, whether for decorative or protective purposes, or for some other reason

(and, if not, why not).  More generally, the rationale developed by Commerce on remand shall give

careful consideration to and shall clearly identify and discuss any potential for unintended

consequences and/or absurd results associated with its interpretation of the language of the Orders,

as well as any other matters that Commerce may deem appropriate.

## IV.  Conclusion

For the reasons set forth above, Plaintiff's Motion for Judgment on the Agency Record must

be granted, and this matter remanded to the U.S. Department of Commerce for further action not

inconsistent with this opinion.

A separate order will enter accordingly.


                                                    _____/s/ Delissa A. Ridgway_____
                                                          Delissa A. Ridgway
                                                                 Judge


Dated:   November 24, 2014
              New York, New York